Exhibit 1

# CONTRACT FOR TRANSPORTATION SERVICES

This Agreement, dated as of April 23, 1996 to be effective as of May 1, 1996, (the "Effective Date") is entered into by and between Automotive Component Carrier, Inc., formerly known as Dedicated Freight Systems, Inc. ("Carrier"), an Ohio corporation that is a wholly-owned subsidiary of Leaseway Transportation Corp., a Delaware corporation, with offices at 30800 Telegraph Road, Suite 4900, Birmingham, Michigan 49025, and General Motors Corporation, NAO Logistics Operations, a Delaware corporation with offices at 3044 West Grand Boulevard, Detroit, Michigan 48202.

Pursuant to an Asset Purchase Agreement dated as of the date hereof between the parties ("Purchase Agreement"), Carrier has acquired various assets of GM's NAO Transportation business unit ("NAO-T") which previously transported components between locations in SE Michigan. This Agreement describes the transportation and transportation-related services which Carrier will provide for General Motors Corporation, and its divisions (collectively "GM").

## Scope of Agreement; Appendices

This Agreement covers ongoing transportation and transportation-related services ("Transportation Services") to be provided by Carrier for GM in order to meet the distinct needs of GM. This Agreement supersedes any previous agreement between the parties for Transportation Services covered hereby. Routes, charges and other details under this Agreement are set forth in one or more Appendices hereto signed by an authorized representative of the parties. In the event of a conflict in any provision, the provision of each Appendix shall control with respect to Transportation Services covered by such Appendix.

I. **Transportation Services**

(i) 50% of purchases in excess of the amount that represents the Volume Commitment plus $1 million in any Determination Year ("Credits") may be carried forward indefinitely or back for one year to meet a Deficiency in such year or subsequent Determination Years that is due in significant part to a Market Event (as hereinafter defined);

(ii) any Credits earned with respect to 1996 or 1997 cannot be used prior to 1998;

(iii) the cumulative amount of unused Credits held at any given time shall not exceed $8 million, only $4 million of which may be used in any Determination Year;

(iv) Credits may be used only to meet a Deficiency arising from or otherwise relating to: (a) a significant decline in the US vehicle market served by all vehicle manufacturers, (b) a significant volume downturn of GM vehicles, (c) plant closure(s) of a GM plant(s) then serviced pursuant to this Agreement, (d) as a credit against the Surcharge (hereinafter defined) in the event that a Deficiency Payment has been paid and GM subsequently chooses to carry such Credit back in accordance with the foregoing clauses (a) through (c) and Section 1.2(a)(i), or (e) other mutually agreeable circumstances; as determined by GM in its sole reasonable discretion, in the case of circumstances referred to in the foregoing clauses (a) through (d); and

(v) notwithstanding the amount of Credits that GM may have accrued, the actual volume of GM purchases in a Determination Year must aggregate at least $41,000,000 (including the Human Resource Center/Motorsports Activity and $1.5 million of American Axle business) ("Floor").

Carrier will meet with GM at least quarterly to discuss improvements to the services and potential growth opportunities, and the price thereof, provided to GM hereunder, and to identify alternative routes that could be moved to Carrier from other GM locations in the event of a plant shutdown, volume downturn or any other condition which may impact GM's ability to meet the above Volume Commitment in a manner satisfactory to both parties, and for both parties to discuss the outlook for future revenue and to address any expected or potential shortfall. Carrier shall provide monthly status reports to GM summarizing Transportation Services provided during each month, including year-to-date volumes. Within thirty (30) days after the end of each Determination Year, Carrier shall prepare and forward to GM a detailed calculation of the Deficiency Payment, which amount shall be due forty-five (45) days after receipt of invoice. At GM's request, Carrier shall supply GM with such additional information supporting Carrier's calculation of the Deficiency Payment. In any case, both parties will work together in good faith through the Quarterly Business Reviews to anticipate and resolve any potential issues related to the Volume Commitment; and Carrier will use reasonable efforts to mitigate the amount of any Deficiency Payment.

b. Exceptions. Notwithstanding Section 1.2.a, no portion of a Deficiency Payment shall be owed for any Determination Year to the extent that such portion is due to (i) after December 31, 1998, Carrier's inability to expand its routes to provide similar Transportation Services in the continental United States (beyond Southeastern Michigan) and/or Ontario, Canada, under market based terms and conditions, (ii) volume handled for Transportation Services by another carrier at a price lower than Carrier's, which price Carrier had the opportunity to meet, (iii) Carrier's failure to be competitive in the areas of quality, technology or service, (iv) Carrier's failure to meet its other obligations under this Agreement by reason of causes within Carrier's control; or (v) Carrier's decision to provide Transportation Services to GM of a volume less than the Volume Commitment for any Determination Year (such decision will be provided to GM in writing and GM will be notified as soon as possible, and before a Quarterly Business Review if appropriate, by Carrier).

(c) Definition. For purposes of this Section 1.2, "Determination Year" shall mean a calendar year during the period beginning January 1, 1997 and ending December 31, 2003, and the partial years (as to which all amounts referred to herein shall be prorated) of 1996 and January 1 through April 30, 2004.

1.3 Commencement of Services. Commitments for specific Transportation Services are made by GM with issuance of a shipping document (e.g., bill of lading, shipping notice, shipping order) in either written or electronic form, in accord with GM established procedures. All information communicated electronically will be in compliance with standards of the American National Standard Institute. All shipping documents issued by GM will be subject to the terms and conditions of this Agreement and the applicable Appendix.

1.4 Drivers, Operators and Equipment. Carrier will provide all facilities, equipment, and properly trained and licensed drivers and other personnel. Motor vehicles and other

equipment necessary to perform Transportation Services will be maintained in good working condition, and operated in a safe, efficient and economic manner. Carrier's drivers and other personnel will conduct themselves in a professional manner at all times. The number and type of any special vehicles or equipment required for the Transportation Services will be described in appropriate Appendices; except as provided in any such Appendices, GM will have no responsibility for such special vehicles or equipment separate from or in addition to the responsibilities provided herein.

1.5  Control of Transportation Services. GM will not request, and Carrier is not expected to perform, Transportation Services which will require Carrier, its drivers or other personnel to exceed or violate speed, safety or transportation laws, or any other applicable laws, rules or regulations. Carrier has sole and exclusive control over the manner in which its drivers and other personnel perform Transportation Services. Such individuals will at all times be employees or subcontractors of Carrier, and will be subject to employment, discharge, discipline and control solely by Carrier which will be fully responsible for their acts. The relationship between the parties hereto will, at all times, be that of independent contractors.

1.6  Cooperation; Best Efforts. The parties will cooperate in all matters relating to Transportation Services, including efforts to improve processes and reduce the cost of Transportation Services for their mutual benefit. Carrier will use its best skills and judgment to perform the Transportation Services in furtherance of the interest of GM in a safe, timely, diligent, efficient and economical manner.

II.  Charges; Payments; Records

2.1  Basic Charges. Basic charges for Transportation Services between specified points are set forth in the Appendices; no other charges, other than the Labor Surcharge (hereinafter defined) apply to Transportation Services provided under this Agreement. The charges

set forth in the Appendices remain fixed throughout the term of such Appendices, except as otherwise expressly set forth in such Appendices.

2.2 <u>Shipping Documents</u>. Carrier will include on all shipping documents correct identification of the goods shipped in accordance with GM's instructions and Carrier's requirements. Identification of the goods on bills of lading and invoices will be sufficient to enable GM to easily identify the goods.

2.3 <u>Invoice; Payment</u>. Time for payment will commence upon receipt by GM of a correct and complete invoice for Transportation Services rendered, and any cash discount privileges will be extended until such time as payment is due hereunder. Except for invoices of the Deficiency Payment, the payment date will be on the 25th day of the month which follows the month of GM's receipt of a proper invoice at the location directed by GM, unless the parties have agreed in writing to electronic funds transfer, in which event GM will transfer funds electronically to the bank designated by Carrier in the applicable electronic funds transfer/ electronic data exchange agreement. In such event, the payment term will be extended an additional three days. If the 25th day of the month is a Saturday, Sunday or bank or GM holiday, then payment will be on the next business day thereafter. Each party retains the right for 18 months following payment to identify any erroneous under or over payment of the individual rates identified in this Agreement, and to file a claim accordingly. Freight bills which are submitted for payment for services that were performed (determined by shipping date) more than 18 months prior to receipt of the freight bill by GM will not be accepted for payment.

2.4 <u>Financial Records</u>. At the request of GM, Carrier will provide GM true and correct information as to its and Leaseway Transportation Corp.'s financial condition and copies, certified if available, of their respective current financial statements. In addition, Carrier will keep reasonable account of its cost of Transportation Services hereunder and of the Surcharge, in each case based on its customary accounting procedures and the terms of this Agreement. These records will be subject to review by GM during Carrier's normal

business hours and at Carrier's facility (subject to GM's agreement to retain Carrier's proprietary data in confidence) in order to verify compliance with the terms of this Agreement, and prior to GM's agreeing to any Surcharge, Deficiency Payment or rate adjustment for Transportation Services pursuant to this Agreement.

2.5 Labor Surcharge. GM agrees to pay Carrier, in addition to the basic rates described in the Appendices, a labor surcharge ("Surcharge") of up to the Initial Surcharge Amount per year (prorated for partial years in 1996 and 2004) for each of calendar years 1997 through 2003 and until April 30, 2004 ("Surcharge Period"), calculated according to the formula set forth in this Section 2.5. Examples of Surcharge calculations are set forth in Appendix 2.5 to this Agreement. The Surcharge shall be invoiced on a monthly basis with respect to Eligible Transferred Employees and Eligible New Employees employed by Carrier as of the 16th day of each month, commencing the Effective Date, and shall be accompanied by a detailed schedule substantiating the amount of the Surcharge and calculations hereunder. No Surcharge is payable for any period after April 30, 2004.

Step 1. [ MSETE] X [Total # Eligible Transferred Employees]

**plus**

Step 2. [Total # Eligible New Employees] X [MSETE - [50% X $38.57 per hour - New Rate per hour) X 2300/12]]

**minus** (May 1, 1999 through April 30, 2004 only)

Step 3. $62,500 per month

*WHERE:*

(a) "Eligible Transferred Employee" is a Transferred Employee (as defined in the Purchase Agreement) who (i) has not "broken seniority" (as that term is defined in the

- 7 -

1993 GM-UAW Agreement), and (ii) has not returned to GM as an active or temporary employee.

(b) "Eligible New Employee" is a new hourly employee hired by Carrier on and after May 1, 1996 in anticipation of the commencement of Transportation Service under this Agreement who (i) is not a retiree of GM or Carrier, and (ii) is directly and substantially actively involved in providing Transportation Services to GM under this Agreement. Calculations relating to Eligible New Employees will be made on a class by class basis, depending on the New Rate applicable to such Eligible New Employee.

(c) "New Rate" means total labor rate, including pension, health coverage, life insurance and any and all other employee benefits offered to hourly employees by Carrier.

(d) "Initial Surcharge Amount" means $15,474,000 reduced or increased by $88,728 per employee for reductions or additions, respectively, to the 519 active Eligible Transferred Employees used as the basis for these calculations, to reflect actual employment levels as of the Effective Date of this Agreement; provided, however, that if the number of active Eligible Transferred Employees is reduced to 500, any further reductions in the Initial Surcharge Amount shall be at a rate of $27,576.

(e) "Monthly Surcharge" means one twelfth of the Initial Surcharge Amount.

(f) "MSETE" means the Monthly Surcharge per Eligible Transferred Employee as of the Effective Date.

(g) The total number of Eligible Transferred Employees plus Eligible New Employees will never exceed 513, plus the number of Inactive Employees (as defined in the Purchase Agreement) who become considered Transferred Employees in accordance with the terms of the Purchase Agreement. If calculations of the Surcharge pursuant to Steps 1 through 3 above results in a negative number, Carrier shall credit GM with such amount, within 45 days after quarter end, against amounts that are otherwise due to Carrier for services rendered under this Agreement.

*50/50 split to GM* [handwritten]

2.6    <u>Rate/Volume Adjustments</u>. During the second and fifth years of the Term, GM, in its sole discretion but with the advice of Carrier, shall determine the then current market rates of the routes listed in Exhibit 2.6 hereto ("Basket"), based on representative bids, benchmarking, and other factors deemed appropriate by GM, in its sole discretion. Effective as of May 1, 1998 and May 1, 2001, as the case may be, the rates hereunder shall be adjusted upward or downward to reflect the percentage change in the aggregate price of the Basket from the Effective Date (or in the case of the 5/1/01 adjustment, from 5/1/98) to the date on which a determination is made by GM under this Section 2.6, and mutually agreeable adjustments will be made to the Volume Commitment, Floor and Credits (amounts that may be accrued/used in a Determination Year); provided, however, that any such adjustment may not exceed the percentage change in the Basket; and provided further that any routes the prices of which have been adjusted during the interim period immediately preceding the date on which a determination is made by GM under this Section 2.6, shall be handled separately on a case by case basis.

2.7    <u>Workers Compensation Adjustments</u>. If, with respect to any year as to which a Surcharge is paid to Carrier, Carrier's actual costs of workers compensation ("WC") are less than the amount of WC costs reimbursed to Carrier as part of the Surcharge (currently 8.25% of payroll), then GM shall be reimbursed for such excess WC amount as follows:

(i)    third party insurance coverage - if the premium has been reduced as a percentage of payroll from that in effect at the beginning of a year during the Surcharge Period, the Surcharge will be adjusted prospectively as soon as practicable to reflect such reduction, provided that in subsequent years the percentage may then similarly be increased up to a maximum of 8.25% of payroll;

(ii)    self insurance - if the sum of WC amounts paid by Carrier during a year during the Surcharge Period plus a reserve established by Carrier in accordance with generally accepted accounting principles ("GAAP") relating to such WC claims, is less than the amount paid by GM with respect to such year as part of the Surcharge, then Carrier shall pay GM the amount of such difference within thirty (30) days after the end of such year; and

(iii)    at the end of the Surcharge Period, if (a) the sum of WC insurance premiums paid plus, if Carrier self insures at any time during the Surcharge Period, actual out-of-pocket WC amounts plus a reserve under GAAP for such WC claims, <u>is less than</u> (b) the total amount paid to Carrier by GM with respect to WC under the Surcharge, then Carrier shall reimburse GM for the amount of such difference.

### III. Insurance

3.1    <u>Minimum Insurance Requirements</u>. During the term of this Agreement, Carrier will maintain policies of insurance in the following minimum types and amounts, unless

increased minimum types and amounts are required due to the equipment or requirements of specific Appendices or shipping documents:

    A.    Workers compensation in an amount not less than the statutory limits for the state(s) or province(s) in which Transportation Services are to be performed, including employer's liability insurance in an amount not less than $500,000. If Carrier is self-insured, upon request a certificate from the jurisdiction in which the Transportation Services are to be performed must be furnished

    B.    Broad form comprehensive general liability insurance, including contractual liability coverage, with minimum limits of liability of not less than one million dollars per occurrence combined single limit for personal injury and property damage.

    C.    Automobile liability insurance (including owned, non-owned, and hired vehicles) with minimum limits of not less than one million dollars per occurrence combined single limit for personal injury and property damage.

    D.    Cargo insurance with minimum limits covering the fair market value as reasonably determined by GM of all goods transported hereunder.

Carrier will maintain all such insurance in force until and unless waived in writing by GM. This coverage will be primary coverage to any other insurance which may be available to GM. If any governmental body requires minimum amounts of insurance in excess of that required in this Section, such required minimum will take precedence.

3.2    <u>Certificates</u>. All insurance policies will be issued by reputable insurance companies authorized to do business under the laws of the state(s) or province(s) in which Transportation Services will be performed. Upon request by GM, Carrier will furnish to

GM, or its designated representative, certificates(s) evidencing such insurance. Each certificate will set forth the amount of coverage, policy number and date of expiration and, as to coverages required in subsections 3.1(B) through (D) above, name GM as an additional insured. Such certificate(s) will include that the insurance carrier will not terminate, cancel, or materially modify such insurance coverage without 30 days prior written notice to GM.

3.3 <u>No Limitation</u>. The purchasing of insurance and furnishing of certificate(s) does not relieve Carrier of its obligations or liabilities under this Agreement.

IV. **Loss and Damage; Limited Indemnity**

4.1 <u>Property Damage and Loss</u>. Unless otherwise specified in the applicable Appendix, Carrier will be responsible for the full actual loss or damage to goods under this Agreement. Carrier will accept claims for loss or damage in writing or via electronic transmission for up to nine months following delivery by Carrier. Thereafter, the parties will cooperate in order to resolve and pay any claim within 45 days.

In assessing any loss or damage, Carrier understands some of the goods which are transported for GM, including vehicles and many parts thereof, involve distinct needs surrounding maintenance of the quality associated with GM parts and vehicle safety. In this context, Carrier agrees to abide by GM's reasonable determination concerning the marketability of damaged goods.

4.2 <u>Limited Indemnity</u>. Carrier agrees to indemnify, defend and hold GM (including its employees and other representatives) harmless from and against any and all claims (including liabilities, penalties, costs, law suits, demands, reasonable attorney's fees and other expenses), for damage to property or injuries (including death) to any person, arising out of (i) any act or omission by Carrier, its employees or representatives (ii) any claims by Carrier's employees or other representatives in connection with their work hereunder on or with GM's property, except for any such claim arising out of the sole

- 11 -

negligence of GM, or (iii) the failure of Carrier, its employees or other representatives to comply with this Agreement, the Appendices, or any applicable law, rule ordinance, regulation, or government directive.

## V. Force Majeure, Failed Delivery

5.1 <u>Force Majeure</u>. Any delay or failure of a party to perform its obligations hereunder, other than amounts that may be owed under Section 2.5, will be excused if, and to the extent that, such delay or failure is caused by an event or occurrence beyond the reasonable control of such party and without its fault or negligence, such as, by way of example, acts of God or the public enemy, fire, flood, labor disorder, civil commotion, closing of the public highways, and actions of a government authority (whether or not valid); provided that written notice of such delay (including the anticipated duration of the delay) is given by the affected party to the other within 10 days (in addition to any notice required by Section 5.2). Should Carrier invoke this clause, GM may use other means to fulfill its transportation requirements, and shipments made by GM by such other means during such period of force majeure, and until 10 days following receipt of Carrier's notice of resumption, will be credited against any volume commitments made by GM in Appendices hereto. If a Carrier delay not caused by GM or GM's vendors or customers lasts more than 30 days or Carrier does not provide adequate assurance that such delay will cease within 30 days, GM may immediately terminate the route(s) affected by such delay without liability, and a corresponding adjustment will be made to the Volume Commitment, Floor and Credits.

5.2 <u>Failed Delivery</u>. In the event Carrier cannot for any reason deliver a shipment within the agreed upon service schedule, immediate notice will be provided the shipping and receiving locations in accord with GM's Rules and Accessorial Charges Addendum.

## VI. Term and Termination

6.1 Initial Term and Continuation. This Agreement is effective as of May 1, 1996 and shall expire on April 30, 2004 ("Term"). Thereafter, this Agreement will remain in effect (other than provisions relating to the Surcharge or Volume Commitment and provisions that by their terms expire prior to such date) until terminated by either party, with or without cause, by giving the other party at least 30 days' prior written notice thereof. Appendices hereto may be terminated individually in accord with their terms and the terms of this Agreement, and will terminate upon termination of this Agreement prior to April 30, 2004.

6.2 Termination for Cause. Notwithstanding any other provision of this Agreement, GM may at any time immediately terminate this Agreement for cause if Carrier materially defaults in its obligations under this Agreement or the Purchase Agreement and Carrier fails to (i) promptly initiate action to cure such default upon receipt of notice of such default, or (ii) to diligently pursue such corrective action, or (iii) cure such default within 30 days after such notice or such longer period as is necessary in GM's reasonable opinion given the curability of the default and the nature of the corrective action, except that in no event shall such longer period exceed 90 days.

6.3 Remedies. The rights and remedies reserved to GM under this Agreement shall be cumulative, and additional to all other or further remedies provided in law or equity.

## VII. Confidentiality; Advertising

7.1 Confidentiality. Each party will keep confidential, in accord with its procedures for maintaining the confidence of other confidential information of similar kind, the terms of this Agreement, including the Appendices hereto, and not disclose such information to non-affiliated third parties (excluding freight bill auditors, freight bill payers, consultants and the like who are reasonably expected to maintain such confidence) except as required by law, rule or regulation.

7.2     Advertising. Carrier will not advertise or publish the fact it has contracted to furnish Transportation Services herein agreed upon, or use any trademark or tradename of GM in advertising or promotional materials, without first obtaining the written consent of GM.

7.3     Information Systems. The parties understand that GM's reliance upon the systems of Carrier will, through time, make it difficult to separate from Carrier; yet the interfacing of systems is not intended to tie the parties inextricably together. Accordingly, in the event of termination of this Agreement for any reason, Carrier agrees to cooperate with GM and at Carrier's option, either continue to provide mutually agreeable service to GM under reasonable terms consistent with this Agreement, or provide GM with reasonable access to Carrier's systems in order for GM to extricate its scheduling and other information from Carrier and continue those activities in a reasonably seamless manner. Nothing herein constitutes a license for the use of any proprietary software; however, Carrier further agrees upon written request of GM to provide GM, for a reasonable fee and on reasonable terms, including a reasonable time period, a non-exclusive, non-transferable license to Carrier software for the limited purpose of maintaining the transportation services operated hereunder upon termination of this Agreement for any reason other than termination by Carrier due to material breach of GM.

## VIII. Notices

Any notice required or permitted to be given by either party under or in connection with this Agreement or any Appendix must be in writing and will be deemed duly given when personally delivered, or when sent by a fax which is acknowledged by the other party, or when sent by postage pre-paid first class mail, to the party's address set forth in the first paragraph of this Agreement, marked to the attention of the senior transportation executive at that location (if to GM, Attention: Executive Director, Logistics), or to such other address as may be requested by either party in writing.

## IX. General Provisions

9.1 <u>Compliance with Laws</u>. Carrier will comply with all applicable provisions of any federal, provincial, state or local law, rule or regulation, and with all lawful orders, rules and regulations issued thereunder, and any provisions, representations, or contractual clauses required thereby to be included in this Agreement are hereby so included. Without limiting the foregoing, Carrier will, at its expense, obtain any permits and licenses applicable to intraprovincial, interstate and/or intrastate transportation which are necessary for Carrier to provide Transportation Services for GM, and will also be responsible for complying with all applicable requirements of federal, provincial and/or state social security, unemployment compensation and tax withholding laws, and all applicable federal, provincial, state and local laws, rules and regulations pertaining to (i) immigration, (ii) occupational health and safety of its employees, (iii) wages and hours of employment, and (iv) affirmative action, equal employment opportunity and employment practices, and in this connection agrees that it will not discriminate in its employment practices due to age, sex, race, color, creed, or national origin.

9.2 <u>Waiver</u>. The failure of either party at any time to require performance by the other party of any provision of this Agreement will in no way affect the right to require such performance at any time thereafter, nor will waiver of either party of a breach of any provision of this Agreement constitute a waiver of any succeeding breach of same or any other provision.

9.3 <u>Governing Law</u>. This Agreement is to be construed according to the laws of the State of Michigan.

9.4 <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable under any law, rule or regulation, such provision will be deemed reformed or deleted, but only

to the extent necessary to comply with such law, rule or regulation, and the remaining provisions of this Agreement will remain in full force and effect.

9.5   Modification. No waiver, alteration or modification of any of the provisions of this Agreement, or any of the Appendices referred to herein, will be binding upon either party unless in writing signed by an appropriate representative.

9.6   Entire Agreement. This Agreement, together with any Appendices hereto, constitutes the entire agreement between GM and Carrier with respect to the subject matter hereof and supersedes all prior oral or written representations and agreements.

9.7   No Assignment. Neither party may assign this Agreement to another, whether or not an affiliate, without the prior written approval of the other.

9.8   Rules And Accessorial Charges. GM's Rules And Accessorial Charges Addendum For Contract Motor Carriage dated January 1, 1991, as amended as of the date of this Agreement, are incorporated into this Agreement. Any revision to such Rules And Accessorial Charges Addendum will also become a part hereof, provided (i) GM provides Carrier with a copy of such revision, and (ii) Carrier does not object to such revision within 30 days of receipt thereof. If Carrier does so object, the parties agree to, in good faith, negotiate appropriate changes to recognize the Carrier's costs associated with such revisions.

9.9   Limited Waiver. The parties acknowledge that all Transportation Services are provided as "contract carriage" within the meaning of applicable federal statutes. To the extent permitted by law, all rights and remedies each party may have to the other under applicable federal laws and regulations, as amended from time to time, shall be deemed waived but only to the extent such rights and remedies conflict with the rights and remedies expressly provided to each party under this Agreement. Neither party waives any rights or remedies it may have as to any third party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representative as of the day and year first above written, to be effective as of May 1, 1996.

| AUTOMOTIVE COMPONENT CARRIER, INC. | GENERAL MOTORS CORPORATION NAO LOGISTICS OPERATIONS |
|---|---|
| By: *(signature)* | By: *(signature)* |
| Name Typed: Gregory Humes | Name Typed: James Zamjahn |
| Title: President | Title: Executive Director, WWP |

Leaseway Transportation Corp. hereby unconditionally guarantees to GM the performance by Carrier, and by its successors to or assigns of the foregoing Agreement, of all of Carrier's obligations under the foregoing Agreement.

Leaseway Transportation Corp.

By: *(signature)*

Name Typed: William Allport
Title: Vice President

trans6.doc 04/23/96 12:50 PM