UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE KOSA, et al.

      Plaintiffs,

v.

                                     Civil Case No. 13-cv-11786
                                     Honorable Patrick J. Duggan

INTERNATIONAL UNION UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA, LOCAL 659, INTERNATIONAL
UNION UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA, GENERAL MOTORS, LLC, and
AUTOMOTIVE COMPONENT CARRIER, INC.,

      Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANT GENERAL MOTORS, LLC'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(c)

On April 20, 2013, 257 employees, former employees or retirees of Defendant Automotive Component Carrier, Inc. ("ACC") filed this lawsuit alleging three counts: (I) violations of Section 301 of the Labor and Management Relations Act ("LMRA"), 29 U.S.C. § 185; (II) violations of the duty of fair representation under Section 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159; and (III) common law fraud under Michigan law. Presently before the Court is Defendant General Motors, LLC's motion to dismiss, filed

pursuant to Federal Rule of Civil Procedure 12(c) on September 16, 2013. Plaintiffs filed a response to the motion on October 7, 2013; GM filed a reply brief on October 21, 2013.[1] On October 30, 2013, the Court held a motion hearing.[2]

## I. Applicable Standard

A motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is subject to the same standards of review as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can

---

[1] In its reply brief, GM asks the Court to strike Plaintiffs' response brief. GM contends that Plaintiffs' brief does not comply with the font size requirements set forth in the local rules and therefore is not likely in compliance with the rules' page limit restrictions. (GM's Reply Br. at 1 n.1.) GM may be correct that Plaintiffs' brief is typed in a font smaller than 10-1/2 characters per inch (non-proportional) or 14 point (proportional). *See* E.D. Mich. LR 5.1(a)(3). Although it appears to the Court that GM's reply brief also fails to comply with these requirements. In any event, Plaintiffs' response brief is only thirteen and a half pages long. The Court doubts that complying with the font-size requirements would have resulted in Plaintiffs exceeding the twenty-five page limit set forth in Local Rule 7.1(d)(3). As such, the Court declines GM's request to strike Plaintiffs' brief.

[2] At the conclusion of the motion hearing, the Court granted Plaintiffs' request to file a second amended complaint to set forth additional facts relevant to their claim against the International Union United Automobile, Aerospace and Agricultural Implement Workers of America, Local 659. The Court delayed ruling on the pending motions until Plaintiffs filed their amended pleading and Defendants had an opportunity to respond, if they chose to do so. The Court notes that while Plaintiffs' Second Amended Complaint slightly modifies their allegations against General Motors, LLC, it does not impact the arguments made by the parties respecting General Motors LLC's pending motion to dismiss.

be granted. *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998). A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 , 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct at 1966).

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). The plausibility standard "does not

impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668, 129 S. Ct. at 1949. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965-66). Although a court ruling on a Rule 12(b)(6) motion "primarily considers the allegations in the complaint," matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be considered. *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (citation omitted). The court also may consider documents incorporated by or referred to in the pleadings, as well as documents that are central to the plaintiff's allegations even if not explicitly incorporated by reference. *See Weiner v. Klais and Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

## II. Factual and Procedural Background

Pursuant to an Asset Purchase Agreement executed by GM and ACC on

April 23, 1996 (hereafter "1996 Agreement"), ACC purchased certain assets and assumed certain obligations of the NAO Transportation business unit ("NAO-T") of the General Motors Corporation ("GM").[3] (GM's Mot. Ex. A.) The 1996 Agreement was effective as of May 1, 1996. (*Id.*, § 1.5.) NAO-T provides GM and certain other customers with trucking and transportation services in Southeastern Michigan. (*Id.* at 1.) Pursuant to the 1996 Agreement, existing GM NAO-T employees were hired by ACC as of the effective date and were referred to as the "Transferred Employees." (*Id.* § 4.1(B).)

The 1996 Agreement between GM and ACC requires ACC to *inter alia* "provide written notice to GM, as soon as reasonable practicable, whenever a Transferred Employee retires or otherwise breaks seniority or length of service with ACC." (*Id.* § 4.1(C).) The agreement contains a "No Third Party Beneficiaries" clause, providing that it "shall not confer any rights or remedies upon any person other than the Parties hereto." (*Id.* § 10.8.)

The Transferred Employees were members of the Transportation Unit of Defendant Local 659, International Union, United Automobile, Aerospace and

---

[3] Plaintiffs allege that Defendant General Motors, LLC is the successor corporation to GM. (2d Am. Compl. ¶ 6.) General Motors, LLC indicates that GM is now doing business as Motors Liquidation Company. (Br. in Supp. of Mot. at 2.) For ease of reference, at this juncture, the Court will refer to the GM-related entities simply as "GM".

Agricultural Implement Workers of America ("Local Union"). (2d Am. Compl. ¶ 5.) The Local Union is affiliated with Defendant United Automobile, Aerospace and Agricultural Implement Workers of America ("International Union") (hereafter jointly referred to as the "UAW"). Plaintiffs allege that the UAW was the exclusive bargaining representative of ACC employees, including Plaintiffs, and that the terms and conditions of their employment were governed by labor agreements between GM and/or ACC and the UAW. (*Id.*)

On September 3, 1996, GM, the International Union, and ACC entered into a "Memorandum of Understanding Regarding the Impact on Employees of the Sale of NAO Transportation Fleet Business Unit" (hereafter "1996 MOU"). (GM's Mot. Ex. B.) The 1996 MOU reflects the parties' understanding that the applicable terms of the 1993 collective bargaining agreement ("CBA") between GM and the International Union would be assumed by ACC. (*Id.* § 1.) It further reflects their understanding that the contract between GM and ACC requires ACC to employ all of GM's active hourly represented Transportation Fleet employees as of the date of sale ("the Effective Date") and assume "the GM seniority status of Transferred Employees for purposes of continued employment with [ACC] and seniority standing under the [ACC]-UAW Agreement." (*Id.* §§ 2(a), 3.)

The 1996 MOU states that "[u]pon [ACC] assuming the GM seniority status

of Transferred Employees on the Effective Date, their status with GM will be on "indefinite layoff" with rights as defined in th[e] Memorandum." (*Id.* § 4.) Under a provision entitled "Re-Employment by GM," the 1996 MOU provides in full:

    a.    Any Transferred Employee, who makes written application to GM on or before September 14, 1997, will be eligible for future employment at GM plants on the same basis as laid-off GM-UAW employees pursuant to the provisions of Appendix "A", of the GM-UAW National Agreement. Applicants will be offered opportunities for meaningful employment within General Motors in a manner that protects the effectiveness of the on-going operations for [ACC] and GM in accordance with the discussions between the parties, as openings occur.

    b.    In the event [ACC] or its successor company ceases doing business, Transferred Employees who retain GM seniority pursuant to Paragraph (64)(e) of the GM-UAW National Agreement may make application to return to GM under Appendix "A" of the GM-UAW National Agreement.

(*Id.* § 5.)

In their Second Amended Complaint, Plaintiffs allege that in 1998, pursuant to the 1996 Agreement, a group of ACC employees was created which is referred to as the "New Business Unit" ("NBU"). (2d Am. Compl. ¶ 8.) Plaintiffs refer to the original employees, or Transferred Employees, as the "Existing Business Unit" ("EBU").[4] (*Id.* ¶ 7.) Plaintiffs allege that the NBU group was paid lower wages

---

[4] The Court will refer to the employees transferred from GM to ACC interchangeably as the Transferred Employees or EBU group.

and benefits than the EBU group, but that "the NBU contract called for one NBU group-member to be moved up into the EBU group for every two EBU's who retired." (*Id.* ¶ 8.) Plaintiffs claims that these terms were included in subsequent contracts in 1998, 2001, and 2004.[5]

In 2009, GM, ACC, and the International Union negotiated a "Special Attrition Plan" ("SAP") which is outlined in the May 28, 2009 "Memorandum of Understanding Special Attrition Plan ACC, GM and UAW" (hereafter "2009 MOU").[6] (2d Am. Compl. ¶ 11; GM Mot. Ex. C.) The 2009 MOU begins by stating that ACC, GM, and the International Union "will jointly develop a communication plan designed to explain to employees of ACC available options

---

[5]The Court does not know which agreements Plaintiffs are referring to when they refer to the "NBU contract" or subsequent contracts in 1998, 2001, and 2004, as Plaintiffs are not specific in their Amended Complaint and the parties neither clarify nor attach any of these agreements to their pleadings. Initially the Court assumed these were collective bargaining agreements ("CBAs") between ACC and/or GM and the UAW; however, Plaintiffs later refer in their Amended Complaint to CBAs with dates of 1997, 1999, and 2004. (*See* 2d Am. Compl. ¶ 65.)

[6]In a pending motion to dismiss filed by the International Union, it is explained that the SAP flowed from the "severe and unprecedented financial distress" GM faced by early 2009 which "threaten[ed] ACC's viability." (*See* ECF No. 17 at 10.) The International Union further explains that the purpose of the SAP "was to reduce ACC's labor costs by eliminating the EBU and NBU, leaving only the third tier PBU" (i.e., the "Progressive Business Unit"- a unit created after the NBU whose employees received even lower wages and benefits). (*Id.* at 10-11.)

-8-

agreed to in this Memorandum." (GM's Mot. Ex. C ¶ 1.) The 2009 MOU outlines different options for ACC employees depending on their status and identifies four status categories:

> a. EBU Red Status - current employees who worked for GM and who were active at the time of the sale of the NAO Transportation Business Unit (the "Business"), have contractual flow back rights to GM and are paid the EBU automotive wage and benefit package
> b. EBU Yellow Status - current employees who were not working for GM at the time of the sale of the Business and have no flow back rights to GM but are paid the EBU automotive wage and benefit package
> c. NBU Status - current employees who were not working for GM at the time of the sale of the Business and are paid at a second tier of wages and benefits (lower than the automotive rate)
> d. PBU Status - current employees who were not working for GM at the time of the sale of the Business and are paid at a third tier of wages and benefits (lower than the second tier)

(*Id.* ¶ 3.)

EBU Red Status and EBU Yellow Status employees were given three options: (1) retire with certain payments and benefits; (2) voluntarily quit with certain payments and benefits; or (3) retain their employment but have their wages and benefits reduced to the level of PBU Status employees in exchange for certain payments and benefits (referred to as the "buy down option"). (*Id.* ¶ 5.) The 2009 MOU further provides that "[a]ll EBU Yellow Status Employees will be given an opportunity to make application to be considered for employment at GM based

upon their longest unbroken seniority at ACC." (*Id.* ¶ 6.) The 2009 MOU required all NBU Status employees to move to PBU status. (*Id.* ¶ 7.)

ACC employees, including Plaintiffs, subsequently were presented with a "2009 Special Attrition Plan Election Form" (hereafter "2009 Election Form"). (GM's Mot. Ex. D.) According to Plaintiffs, union officials told them that ACC's "closing was imminent and that if they didn't sign the [SAP] agreement they would get nothing and be out of work within 48 hours." (2d Am. Compl. ¶ 13.) The 2009 Election Form offers three options: retire, voluntarily quit, or continue employment as a PBU Status employee. (*Id.* ¶ 12; GM's Mot. Ex. D.) It asks employees to acknowledge their evaluation of the options available under the 2009 MOU and that "no prior representations, promises or agreements relating to [their] employment, separation from service, or retirement have been made by ACC, GM, or the UAW, which are contrary to [the 2009 Election Form] and the 2009 [MOU]." (2d Am. Compl. ¶ 15; GM's Mot. Ex. D.) The 2009 Election Form does not set forth the rights of any employees to apply for or secure employment with GM. (*Id.*) According to Plaintiffs, when they were presented with the 2009 Election Form and the Local Union membership was asked to vote on the SAP, they "still did not know about the 1996 agreement that gave them flow-back guarantees and benefits guarantees in the event ACC's existence was threatened."

(Am. Compl. ¶ 19.)

On June 10, 2009, 87% of the Local Union membership voted in favor of ratifying the SAP.  (*Id*. ¶ 18.)  Plaintiffs thereafter signed 2009 Election Forms selecting either the retirement, voluntary quit, or buy down option.  (*Id*. ¶ 22.)  Some time thereafter, Plaintiffs learned that ACC and GM had proposed several additional options to the UAW during the SAP negotiations which had not been conveyed to the membership.  Plaintiffs further discovered that, had they not agreed to the SAP, many of them still would have had the opportunity to gain employment (or re-employment) with GM.  (*Id*. ¶¶ 24, 32.)

On July 23, 2009, Plaintiff Lawrence Kosa asked Local Union committeeman Terry Sims to file a grievance based on the 2009 SAP/MOU.  (*Id*. ¶ 24.)  Plaintiffs contend that the Local Union refused to file the grievance.  (*Id*. ¶ 28.)  On November 15, 2009, Kosa filed an "ACC Appeal submitted under Article 33 of the UAW Constitution" on behalf of himself and other Local Union members who were EBU Red or Yellow Status employees or NBU Status employees.  (*Id*. ¶¶ 35, 36.)  The UAW Local unit executive board voted to deny Kosa's appeal on April 16, 2010, a decision which was upheld by the executive board on June 11, 2010.  Plaintiffs' July 8, 2010 appeal of that decision to the UAW International Executive Board was denied on January 30, 2010.  A

subsequent appeal to the Public Review Board was rejected on January 22, 2013.

Plaintiffs next filed the instant lawsuit in which they allege violations of the LMRA, NLRA, and fraud under Michigan law. In Count I, Plaintiffs allege in part that:

> The actions of GM and/or ACC, jointly and severally, constitute violations of the Collective Bargaining Agreement, in that GM and ACC failed to honor the terms of their 1996 ACC purchase agreement, which was signed by GM, ACC and the UAW and which provided for flow-back rights to ACC employees, including plaintiffs, the terms of which also were in effect in the 1997, 1999 and 2004 collective bargaining agreements.

(2d Am. Compl. ¶ 65.) In this count, Plaintiffs also allege that the UAW violated the LMRA by withholding from and misrepresenting to the membership certain information during the 2009 SAP/MOU and ratification process, including "that there was a flow-back agreement that dated back to 1996 in the event of ACC closing . . .." (*Id.*) Plaintiffs assert that the UAW also violated the duty of fair representation under the LMRA in connection with the 2009 SAP/MOU. (*Id.*)

Plaintiffs' remaining counts alleging violations of the NLRA and fraud are asserted against the UAW based on an alleged failure to inform members of certain information and material misrepresentation of other information in connection with the 2009 SAP/MOU. (2d Am. Compl. ¶¶ 68, 71.)

**III.   GM's Arguments in Support of its Motion to Dismiss and Plaintiffs'**

**Response**

GM seeks dismissal of Plaintiffs' LMRA claim against it, arguing that Plaintiffs set forth no facts supporting their allegation that GM breached a collective bargaining agreement or any other agreement with respect to Plaintiffs. GM maintains that Plaintiffs' Amended Complaint (and now Second Amended Complaint) fails to reference any specific contractual language that GM allegedly violated. GM argues that Plaintiffs cannot assert a violation of the 1996 Agreement because neither the UAW nor any Plaintiff was a signatory to that agreement which was between GM and ACC, only. GM points out that the 1996 Agreement also contains a "No Third Party Beneficiaries" clause.

Although acknowledging that the 1996 MOU and 2009 MOU between the UAW, GM, and ACC provide for certain flow-back rights, GM argues that Plaintiffs' "base allegation" that GM failed to honor those agreements "is unsupported by the remainder of the Amended Complaint." GM points out that Plaintiffs do not allege that GM denied any employee flow-back rights, and in fact acknowledge that employees who did not retire under the 2009 SAP "eventually flowed into GM with top-tier pay and full benefits." (*See* 2d Am. Compl. ¶ 53.) While Plaintiffs assert that GM failed to notify them that they were foregoing those rights by ratifying the SAP, GM argues that Plaintiffs identify no contract

-13-

provision obligating GM to notify employees of those rights.

Turning to Plaintiffs' assertion that the 1996 Agreement and/or 1996 MOU imposed a duty on GM to elevate NBU employees to EBU status upon the retirement of EBU employees, GM contends the assertion is not consistent with the underlying documents and, in any event, any claim based on this conduct is time-barred.  GM argues that the rights of NBU employees alleged by Plaintiffs were not addressed in any agreement to which it was a party.  Second, GM argues that any claim based on this conduct is subject to a statute of limitations period of six months and therefore should have been raised long ago.  Plaintiffs' grievances, GM maintains, did not cover this alleged misconduct and thus the pendency of those grievances did not toll the statute of limitations.

In their arguments in response to GM's motion, Plaintiffs begin by explaining that

> The crux of the entire lawsuit is that [P]laintiffs did not know they had flow back rights.  Therefore, the allegation is not that GM denied flow back rights to specific [P]laintiffs who sought flow back rights; it is that GM, along with other defendants, concealed the fact that flow back rights existed, thereby precluding [P]laintiffs from seeking those rights.

(Pls.' Resp. Br. at 7-8, emphasis removed.)  Plaintiffs' counsel again clarified Plaintiffs' claim against GM at the motion hearing, conceding that GM did not

-14-

"affirmatively deny" Plaintiffs their flow back rights, but breached an alleged contractual duty to offer Plaintiffs job with GM.  Plaintiffs identify the 2009 MOU as setting forth GM's obligation to notify Plaintiffs of their flow back rights, specifically the provision stating that ACC, GM, and the International Union "will jointly develop a communication plan designed to explain to employees of ACC available options agreed to in this memorandum."  (*Id*. at 8, quoting GM's Mot. Ex. C at 1.)  Plaintiffs point out that while the 2009 MOU reflects the EBU Red Status employees' flow back rights and states that EBU Yellow Status employees may make application to GM, those options were not conveyed to Plaintiffs.

In response to GM's statute of limitations defense, Plaintiffs counter that no evidence supports GM's assertion that any failure to elevate NBU employees to EBU status happened long before this action was filed and that the Court would have to consider evidence outside their complaint to make such a finding (thus making the determination inappropriate for a motion to dismiss).  Plaintiffs further respond that the law is not settled as to the statute of limitations applicable to their claim and, they believe, Michigan's statute of limitations for breach of contract claims (i.e. six years) applies.  Because GM was paying a surcharge for ACC employees based on their status level, Plaintiffs surmise that GM was monitoring the number of employees at each level and thus was aware that NBU status

employees were not being moved into EBU wages and benefits in accordance with CBAs between ACC and the UAW.  As such, Plaintiffs argue that "[i]t is likely that when all of the evidence is exchanged, [P]laintiffs will be able to argue that GM knew exactly when each NBU should have been moved up . . . and that conscious decisions were made, to which GM was privy, if not directly involved, not to adhere to the provisions of the ACC-UAW CBA's [sic] that required the NBU's [sic] to move up."  (Pls.' Resp. Br. at 13.)

## IV.     Applicable Law and Analysis

The only count Plaintiffs assert against GM is their claim under the LMRA (Count I).  Count I alleges a hybrid § 301 action under the LMRA.  As the Sixth Circuit has explained, such claims "involve[] two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union."  *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 583 (1994) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 162, 103 S. Ct. 2281, 2289 (1983)).

A § 301 claim cannot be premised on the breach of any contract.  Instead, the statute confers jurisdiction to hear a suit for breach of only a contract between *an employer* and a labor organization (such as a collective bargaining contract) or between two labor organizations.  29 U.S.C. § 185(a).  As such, Plaintiffs cannot

premise their § 301 claim on any promise contained in the 1996 Agreement. Contrary to Plaintiffs' allegations (*see* 2d Am. Compl. ¶ 7), the UAW was not a party to that agreement. While the UAW was a party to other contracts referred to by Plaintiffs in their complaint, *GM* was not a party to many of those contracts.

For example, Plaintiffs refer to CBAs effective from 1997 forward. (2d Am. Compl. ¶¶ 8, 65.) GM indicates however, and the 1996 Agreement reflects, that it was not a party to those post-sale CBAs. (*See, e.g.*, GM's Mot. Ex. A §§ 4.1(D), (F).) Moreover, § 301 relates to contracts between *an employer* and a labor organization. The 1996 Agreement specifically provides that after May 1, 1996, ACC "is the sole employer of all Transferred Employees . . . and GM and its affiliates will not be joint employers with ACC . . .." (*Id.* § 10.1.)

Further, "'it is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached.'" *Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (6th Cir. 2012) (quoting *Harris v. Am. Postal Workers Union*, No. 98-1734, 1999 WL 993882, at *4-5 (6th Cir. Oct. 19, 1999)). Yet Plaintiffs fail to identify any contractual provision creating a duty that GM owed to them and allegedly breached. As clarified in their response brief and at oral argument, Plaintiffs claim GM violated § 301 in two ways: (1) by failing to

-17-

move one NBU group-member to EBU status upon the retirement of two EBU group members; and (2) by not informing Plaintiffs of their flow-back rights or offering them jobs with GM when ACC's viability was threatened.

As to the first, Plaintiffs allege that this duty arose from "the NBU contract" and "subsequent contracts in 1998, 2001 and 2004." (2d Am. Compl. ¶ 8.) Plaintiffs, however, do not allege that this duty was imposed upon GM, specifically; and any duty to change an employee's status presumably fell upon the employer. As stated earlier, pursuant to the 1996 Agreement, Plaintiffs became employees of ACC as of May 1, 1996. Moreover, Plaintiffs neither attach these contracts to their pleadings nor present the actual terms allegedly breached. To their response brief, Plaintiffs attach a "Contract for Transportation Services" executed by ACC and GM on April 23, 1996 and effective May 1, 1996. (Pls.' Resp. Ex. 1.) The UAW is not a party to this agreement. Even if it was, its terms do not impose a duty on GM to elevate NBU group-members.

Plaintiffs point to the Contract for Transportation Services' terms requiring GM to pay certain surcharges based on the number of employees at each status level. Plaintiffs argue that GM therefore knew the number of ACC employees at each level. From this, Plaintiffs speculate that GM was aware of and perhaps involved in ACC's failure to elevate NBU employees to EBU status when two

-18-

EBU employees retired.  But GM's awareness of or involvement in ACC's decision does not state a claim against GM for breach of a labor contract.

To demonstrate that GM had a contractual duty to inform Plaintiffs of their flow-back rights, Plaintiffs refer to the 2009 MOU.  Specifically, Plaintiffs point to the provision stating that ACC, GM, and the International Union "will jointly develop a communication plan designed to explain to employees of ACC available options agreed to in this Memorandum."  (GM's Mot. Ex. C. ¶ 1.)  This language, however, does not create a duty owed by GM to ACC employees to inform them of their flow back rights, much less to offer them jobs at GM.  Plaintiffs identify no other language– or even a labor contract– creating such duties; and the Court does not interpret any contract provided by the parties as requiring GM to inform Plaintiffs of their flow-back rights or opportunity for GM employment.

For these reasons, the Court concludes that Plaintiffs fail to state a § 301 breach of contract claim against GM in their Amended Complaint.

Accordingly,

**IT IS ORDERED**, that Defendant General Motors LLC's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c) is **GRANTED** and General Motors LLC is dismissed as a defendant.

Dated: December 17, 2013             s/PATRICK J. DUGGAN

UNITED STATES DISTRICT JUDGE

Copies to:
Kenneth D. Myers, Esq.
Thomas A. Cattel, Esq.
Kim F. Ebert, Esq.
Andrew A. Nickelhoff, Esq.
Douglas Y. Christian, Esq.
Mami Kato, Esq.