UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LAWRENCE KOSA, et al.,

           Plaintiffs,

vs.

                                    Civil Action No.
INTERNATIONAL UNION UNITED         13-CV-11786
AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT          Honorable Patrick J. Duggan
WORKERS OF AMERICA, LOCAL 659,
INTERNATIONAL UNION UNITED
AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,

           Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANTS' MOTION FOR SANCTIONS**

**I.  INTRODUCTION**

      This is a labor dispute brought under the Labor Management Relations Act

("LMRA"), 29 U.S.C. § 141 *et seq.*, the National Labor Relations Act ("NLRA"),

29 U.S.C. § 151 *et seq.*, and Michigan law.  The remaining 200 Plaintiffs are

former employees or retirees of Automotive Component Carrier, LLC, the entity

that purchased the truck fleet operations of General Motors Corporation ("GM") in

April 1996.  The remaining Defendants are: (1) International Union United

Automobile, Aerospace & Agricultural Implement Workers of America, Local 659 ("Local 659"), the exclusive bargaining representative of Plaintiffs, and (2) International Union United Automobile, Aerospace & Agricultural Implement Workers of America ("International Union"), an agent of Local 659 (collectively, "UAW"). Plaintiffs' principal claim is that UAW breached its duty of fair representation under the LMRA and the NLRA by giving Plaintiffs erroneous information regarding their contractual right to transfer back, or "flow back," to GM following their transfer from GM to ACC in April 1996.

Now before the Court are two motions, both filed by UAW: a motion for summary judgment and a motion for sanctions pursuant to Federal Rule of Civil Procedure 11. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court will decide the motions without oral argument. For the reasons that follow, the Court will grant in part and deny in part the summary judgment motion and deny the motion for sanctions.

## II. BACKGROUND

In April 1996, ACC and GM executed an Asset Purchase Agreement ("1996 Asset Purchase Agreement") in which ACC agreed to purchase GM's truck fleet operations, known as "NAO-T." UAW Ex. 1 at ACC 0001254. As part of the agreement, ACC agreed to hire existing GM NAO-T employees. *Id.* Those

employees – the ones who transferred from GM to ACC at the time of the sale – are referred to by the parties as either "Transferred Employees" or "Red Dots."

Under a separate Contract for Transportation Services executed by GM and ACC on the same day as the Asset Purchase Agreement ("1996 Contract for Transportation Services"), GM agreed to subsidize ACC's contractual obligation to provide GM-level (i.e., first-tier) wages and benefits to Red Dots.  UAW Ex. 3 at ACC 0001364-65.

In September 1996, GM, International Union, and ACC executed a contract entitled "Memorandum of Understanding Regarding the Impact on Employees of the Sale of NAO Transportation Fleet Business Unit," hereinafter "1996 MOU." UAW Ex. 4.  The contract requires ACC to employ Red Dots and assume their GM seniority status.  *Id.* at UAW 000215-16.  The contract also contemplates the re-hiring (i.e., "flow back") of Red Dots by GM at a later date.  Under the heading "Re-Employment by GM," the 1996 MOU provides that Red Dots "will be eligible for future employment at GM plants on the same basis as laid-off GM-UAW employees pursuant to the provisions of Appendix 'A' of the GM-UAW National Agreement," "as openings occur," if they "make[] written application to GM on or before September 14, 1997."  *Id.* at UAW 000216.  The flow-back provision applies only to "Transferred Employees" (i.e., Red Dots), defined in the agreement as "certain [NAO-T] hourly employees who are transferred to [ACC] . . . as of the

effective date of the sale [of GM's NAO-T unit to ACC]," and it gives them a right to flow back to GM only if there is a spot available and if they apply by the deadline. *Id.* at UAW 000214, 000216. Local 659's union shop chair, Rick Toldo, testified that he discouraged Red Dots from flowing back to GM because they would take a pay cut by doing so and because, with one exception, "[n]one of [the EBU employees] wanted to go back." Toldo Dep. at 47-48.

In February 1997, ACC and UAW entered into an agreement ("1997 Agreement") that extended GM-level first-tier wages and benefits to employees hired by ACC after it purchased GM's NAO-T unit. UAW Ex. 8. The employees hired during the term of the 1997 ACC-UAW agreement are referred to by the parties as "Yellow Dots." Red Dots and Yellow Dots are collectively known as the "Existing Business Unit" ("EBU"). All EBU employees – both Red Dot and Yellow Dot – received first-tier wages and benefits; however, as indicated above, the 1996 MOU by its explicit terms conferred flow back rights only to Red Dots. All 200 remaining Plaintiffs in this case were EBU employees; thirty-seven Red Dots and 163 Yellow Dots.

In subsequent years, ACC and UAW entered into additional agreements establishing wages and benefits for new ACC hires. An agreement executed in 1998 created reduced or second-tier wages and benefits for new employees hired by ACC during the term of that agreement, and a 2003 agreement created further

4

reduced or third-tier wages and benefits for employees hired during the term of that agreement.  Employees receiving second-tier wages and benefits under the 1998 agreement are referred to by the parties as the "New Business Unit ("NBU"), and employees receiving third-tier wages and benefits under the 2003 agreement are referred to as the "Progressive Business Unit" ("PBU").

In February 2004, GM and ACC entered into a Contract for Transportation Services ("2004 Contract for Transportation Services") in which ACC agreed to offer retirement packages to all EBU employees – that is, both Red Dots and Yellow Dots – who were then eligible for retirement.  UAW Ex. 22 at ACC 0001182.  In addition, the agreement required GM to either: (a) offer employment, as GM jobs became available but no later than January 31, 2009, to EBU employees who were not eligible for retirement or declined to accept the retirement package offered by ACC, or, (b) for any EBU employee not offered GM employment, remain responsible for its obligations to EBU employees under the 1996 Asset Purchase Agreement, 1996 MOU, and 1997 Agreement, including the obligation to subsidize their first-tier wages and benefits.[1]  *Id.*  By its terms, the

---

[1]  The pertinent language from the 2004 Contract for Transportation Services provides:

> After the Effective Date [February 1, 2004], any such EBU Employee who is not eligible for retirement or who does not accept the retirement package from ACC will be offered active employment by GM as jobs become available . . . with the goal that all offers to such

agreement expired on January 31, 2009; however, the agreement provided that if any Yellow Dot employee had not been offered employment with GM by January 31, 2009, the contract will remain in effect "until such time as all such 'yellow dot' EBU Employees have returned to GM, retired, or have been converted to PBU Employees." *Id.* at 0001186.

As mentioned, EBU employees received wages and benefits that were subsidized by GM.  Toldo testified that from 1996 to 2009, GM constantly attempted to "get rid of" EBU employees and "put them back" in GM plants because GM was paying $26 million per year to subsidize the wages and benefits of EBU employees and "wanted out of the subsidy."  Toldo Dep. at 49-50. Although UAW "[dragged] their feet" and "didn't let it happen," *id.* at 50, GM and

---

EBU Employees will be completed within 18 months after [February 1, 2004], but in no event later than the expiration of the term of this Agreement [January 31, 2009].  For those remaining EBU Employees that are not offered employment by GM . . . during . . . the term of this Agreement, GM agrees that it shall remain responsible for (i) its obligations for such EBU Employees ("red dot" and "yellow dot" only) under the [1997 Agreement], the [1996 Asset Purchase Agreement], and the [1996 MOU]; and (ii) its obligations for the Labor Surcharge and Management Fees related to such EBU Employees ("red dot" only).  If any such EBU Employee declines GM's offer of employment or fails the new hire screening, then he or she will immediately no longer be classified as an EBU Employee, but rather will be classified as a "PBU Employee" subject to the terms and conditions of the Progressive Business Unit Collective Bargaining Agreement.

UAW Ex. 22 at ACC 0001182.

ACC eventually began discussing the implementation of a "special attrition plan" ("SAP") to reduce the number of EBU employees receiving subsidized first-tier wages and benefits.

Toldo explained in his deposition the process governing the implementation of SAPs and his involvement in that process. Toldo testified that he was not involved in SAP negotiations, although he "knew [they] were going on" because he would receive drafts of proposed SAPs in "sort of a backdoor" fashion from "an inside source at ACC." *Id.* at 52, 102, 107-08. Toldo testified that he would become involved in the process only after GM, ACC, and UAW agreed and finalized the terms of a SAP, at which time Toldo's job was to "take [it] to the membership" and "recommend [its] approval." *Id.* at 102-04. According to Toldo, UAW "wouldn't have told [him] anything" about SAP negotiations between GM, ACC, and UAW while they were occurring. *Id.* at 108.

Three SAPs were discussed in 2008, but none of them were finalized and implemented. UAW Exs. D-F. Each proposed SAP, the latest of which is dated October 13, 2008, included various retirement and buy-out/buy-down options for EBU employees. One such option available in all three SAPs proposed in 2008 would have allowed EBU employees with a certain level of seniority to "voluntarily quit" their position at ACC, sever all ties with ACC and GM, and

forgo rights to retiree healthcare benefits, in exchange for a lump-sum payment of $140,000. *Id.*

The next year, GM, ACC, and UAW finalized and implemented a SAP, hereinafter the "2009 SAP." A Memorandum of Understanding regarding the 2009 SAP was signed by all three parties in May 2009. UAW Ex. 13. Michael Grimes, who was then the assistant director for the GM department at UAW, was involved in the negotiation of the 2009 SAP and testified that GM told ACC at the beginning of May 2009 that GM would no longer continue subsidizing the first-tier wages and benefits of EBU employees, and that this news led the parties to negotiate and implement the 2009 SAP. Grimes Dep. at 10, 52-53, 55, 79-80. According to Grimes, "the goal [of UAW] was to basically get the best [it] could get from GM." *Id.* at 55.

Three options were offered to EBU employees under the 2009 SAP: (1) immediate retirement with GM medical coverage, a cash payment of $20,000 or $45,000 (depending on skill level), and a $25,000 vehicle voucher; (2) voluntary resignation with no GM medical coverage, a cash payment of $45,000, and a $25,000 vehicle voucher; or (3) reduction to the third-tier benefits and wages available to PBU employees with a $20,000 cash payment and $25,000 vehicle voucher. UAW Ex. 13 at UAW 001434. Clearly, the retirement and buy-out/buy-down options available in the 2009 SAP were significantly less favorable to EBU

8

employees than the proposed retirement and buy-out/buy-down options that would have been available to EBU employees had any of the three draft SAPs in 2008 been implemented. Alan Schwartz, the general director of labor relations for GM, testified that the amount of incentive money that GM was willing to offer decreased at the end of 2008 and beginning of 2009 because GM was impacted by the economic crisis and downturn in the second half of 2008, and "that's when . . . the . . . CEOs went to Washington" and "the fact that companies were asking for money from the government put a crimp on a lot of spending and a lot of things that went on at GM." Schwartz Dep. at 7, 47, 65.

Notably, the 2009 SAP did not list flow back to GM as an option for EBU employees, although the 2009 SAP specifies that Red Dots "have contractual flow back rights to GM," while Yellow Dots "have no flow back rights to GM."[2] UAW

---

[2] Although the 1996 MOU confers flow back rights only to Red Dots, the 2004 Contract for Transportation Services offered the possibility of something that appears to be similar to flow back for all EBU employees (both Red and Yellow Dots) who either were not then eligible for retirement or declined the retirement package offered by ACC at the time. However, the 2004 Contract for Transportation Services does not grant Yellow Dots a contractual right to flow back to GM; rather, it requires GM to *either* offer employment to non-retiring Yellow Dots, *or* continue subsidizing the wages and benefits of non-retiring Yellow Dots until they have returned to GM, retired, or converted to PBU employees. By contrast, the 1996 MOU grants Red Dots a contractual right to flow back contingent on the Red Dot submitting an application by the deadline and there being an opening. Therefore, the statement in the 2009 SAP that Yellow Dots "have no flow back rights to GM" is not inaccurate.

Ex. 13 at UAW 001433.  However, the 2009 SAP contains the following provision

addressing GM's obligation to employ Yellow Dot employees:

> All EBU Yellow Status Employees will be given an opportunity to
> make application to be considered for employment at GM based upon
> their longest unbroken seniority at ACC.  Eligible employees will be
> considered after all GM collectively bargained contractual obligations
> have been satisfied.   Eligible employees will be considered for
> employment with GM based upon their current seniority date from an
> integrated list of eligible employees from other agreements.  Specific
> guidelines will be made available within 30 days following the
> signing of the agreement.

*Id.* at UAW 001434-35.  Toldo testified that has "no idea" why the 2009 SAP did

not offer EBU employees a fourth option allowing them to flow back to GM and

that, as far as he knew, no one from UAW pushed to include flow back as a fourth

option in the 2009 SAP.  Toldo Dep. at 52-53, 60, 62.  Toldo further testified that

at the time the 2009 SAP was implemented, he believed that Red Dots "absolutely"

had the right to apply to flow back to GM regardless of whether the 2009 SAP was

implemented and regardless of which of the three options EBU employees chose

under the 2009 SAP, and that there was "some dispute" as to whether Yellow Dots

had flow back rights.  *Id.* at 123-27, 129.  Grimes held a different view.  He

testified that Red Dots who selected options one or two under the 2009 SAP

(retirement or voluntary resignation) gave up their flow back rights and that only

Red Dots choosing option three (i.e., the buy-down to PBU status) remained

eligible to flow back to GM.  Grimes Dep. at 61, 68.

10

In June 2009, ACC and UAW sent a copy of the 2009 SAP to EBU employees, along with an election form. UAW Ex. 14. The cover letter explains GM's then-dire financial situation and that ACC and UAW were required to negotiate the 2009 SAP so that GM would receive the government support necessary to allow it to restructure and continue operations. *Id.* The cover letter also announced that an information meeting would be held regarding the 2009 SAP later in the month, and that representatives of UAW and ACC would be present to explain it and answer questions. *Id.* David Lerew, ACC's director of labor relations, attested that the continued financial viability of ACC depended on the implementation of the 2009 SAP: "Given the discontinuation of the GM subsidy and the unavailability of other sources of revenue for ACC to replace the discontinued GM subsidy, ACC would not have been financially viable in the short or long term had the 2009 . . . SAP not been approved and implemented." UAW Ex. 2 ¶ 2.

Grimes testified that UAW generally "does not want" to pursue agreements with GM that involve the loss of first-tier wages and benefits to EBU employees. Grimes Dep. at 100, 102. Rather, Grimes explained that UAW would rather stall such agreements to allow EBU employees to continue making first-tier wages and benefits for as long as possible:

> When we [UAW and GM] go into these discussions, a lot of things happen, and if [GM] [doesn't] pursue it, there's a lot of offers made

11

> during bargaining and especially when we're dealing with buying people down and doing different things that we don't want to do anyway. We don't want that. We don't want to buy people down. So if we can delay it or if it stalls or [GM] [doesn't] bring it up for a year or two, good. We don't want to do it anyway.

*Id.* at 100.

The members of Local 659 were asked to vote whether to ratify the 2009 SAP. Toldo Dep. at 118; McEntire Dep. at 33. As mentioned, an information meeting took place on June 7, before the vote. The record is disputed with regard to what was said by UAW officials at the meeting regarding the following three issues: (1) whether EBU employees had the right to flow back to GM; (2) whether UAW officials told EBU employees that they would never see the inside of a GM plant; and (3) whether UAW officials told EBU employees that ACC would shut down in the event EBU employees did not ratify the 2009 SAP.

With regard to the first issue, Plaintiff Tony Short, a Red Dot, testified that Toldo told EBU employees at the meeting "that we did not have return rights back to the [GM] plant." Short Dep. at 17-19. Short also testified that Bob Eldridge, the benefits representative for UAW, told him that his only options were the three offered in the 2009 SAP. *Id.* at 14. Scott LaFave, a Red Dot, also testified that Eldridge told him that "go[ing] back to the plant" was "not an option." LaFave Dep. at 31. However, Toldo was adamant during his deposition that he always believed that Red Dots had flow back rights to GM even after the 2009 SAP was

ratified.  Toldo Dep. at 57-58, 126.  Moreover, Plaintiff Elton Waggoner, another Red Dot who attended the meeting, testified that no one at the meeting stated that EBU employees did not have flow back rights; rather, according to Waggoner, EBU employees were told that flow back to GM was not possible because there were "no jobs available [at GM] at the moment."   Waggoner Dep. at 28-29. Conversely, Short testified that UAW representatives did not "say anything about [there being] no jobs [at GM]."  Short Dep. at 19.

With regard to the second issue, James Holland, a Yellow Dot, testified that both Toldo and Robert McEntire, Local 659's district committeeman, said at the meeting that EBU employees would never see the inside of a GM plant.  Holland Dep. at 54-58.  Lawrence Kosa, a Yellow Dot, and Leonard Cross, also a Yellow Dot, similarly testified that Toldo and/or McEntire made a statement to the effect that EBU employees would never see the inside of a GM plant.  Kosa Dep. at 100; Cross Dep. at 53.  However, McEntire and Toldo both testified that they did not make that statement at the meeting.  McEntire Dep. at 40, 56; Toldo Dep. at 174. Moreover, Plaintiff Joseph Rice, a Red Dot, testified that he did not recall anyone saying that EBU employees would not see the inside of a GM plant.  Rice Dep. at 31.

A similar dispute exists regarding the third issue – whether UAW officials told EBU employees at the information meeting that ACC would shut down if the

13

2009 SAP was not ratified.  McEntire and Toldo both testified that they never heard anyone say this at the meeting.  McEntire Dep. at 55-56; Toldo Dep. at 133. However, Holland and Cross testified that the statement was made by Lerew, ACC's director of labor relations.  Holland Dep. at 51-52; Cross Dep. at 59.

In addition, a question was asked at the meeting about why EBU employees did not receive a $140,000 buy-out offer like the ones included in the SAPs that were drafted but never implemented in the preceding year.  According to McEntire, Toldo responded to the question by explaining that he received many SAP "offers" but that the only one that mattered was the one that had been agreed-upon and implemented (i.e., the 2009 SAP).  McEntire Dep. at 32-35.  Toldo did not deny saying this.  In his deposition, Toldo testified that he misspoke at the meeting if he used the word "offer," as "they really weren't offers" and, if he used that word, "that was wrong" because they were merely "discussions going on between [the] parties" that did not materialize into an agreement.  Toldo Dep. at 102-03, 106-07.  Grimes testified that "there's a lot of different offers that come across the table [during SAP negotiations] that don't get [acted] on" and "[t]hat's just the way it is."  According to Grimes, "[i]f [UAW] took the first offer that GM gave us in bargaining, our members would die of a cardiac attest."  Grimes Dep. at 102-03.

14

On June 10, 2009, EBU employees voted to ratify the 2009 SAP and, in the subsequent days, made their selections among the three available options.  UAW Ex. 15.  McEntire testified that UAW urged EBU employees to ratify the 2009 SAP because of the economic climate at the time and GM's impending bankruptcy: "Yeah, we all felt it was in the best interest of the drivers to ratify the SAP based on the economic climate and the things that were happening, and with [GM's] bankruptcy."  McEntire at 39-40, 42.  In addition, McEntire testified that he thought the chances of EBU employees going back to GM were "pretty slim based on the climate that we were in," but that if somebody said that EBU employees would "never see the inside of a GM plant," that would person would be "mistaken."  *Id.* at 40-41.  Toldo also felt that GM's impending bankruptcy would likely adversely affect the jobs of EBU employees.  Toldo testified that his view at the time, whether ultimately "right or wrong," was that GM's imminent bankruptcy threatened the jobs of all EBU employees and that it would be "better [for EBU employees] to get something than nothing" or "not know" and "roll[] the dice."  Toldo Dep. at 127-29.  Although Toldo testified that he "absolutely" did not believe that EBU employees would never see the inside of a GM plant, he urged ratification of the 2009 SAP because he "didn't want to take the chance on losing 500 jobs."  *Id.* at 127-28.

Following ratification, EBU employees made their selections among the three available options and returned their election forms.  UAW Ex. 15.  In November 2009, Plaintiff Kosa, on behalf of himself and other EBU employees, initiated internal grievance proceedings that were ultimately unsuccessful.  UAW Ex. 18.

Plaintiffs filed the present lawsuit on April 20, 2013, naming four Defendants: ACC, GM, Local 659, and International Union.  ACC and GM have been dismissed – ACC by stipulation and GM by motion to dismiss.  In its decision granting GM's motion to dismiss, the Court observed that "Plaintiffs fail to identify any contractual provision creating a duty that GM owed to them and allegedly breached" and, consequently, held that "Plaintiffs fail to state a § 301 breach of contract claim against GM."  *Kosa v. Int'l Union*, No. 13-CV-11786, 2013 WL 6631531, at *7-8 (E.D. Mich. Dec. 17, 2013).

 Three claims remain against UAW: a hybrid § 301 claim under the LMRA, a breach of duty of fair representation claim under the NLRA, and a fraud claim under Michigan law.  UAW filed a motion for summary judgment on July 10, 2015, and a motion to sanctions pursuant to Rule 11 on August 26, 2015.

### III.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986)).

## IV.  ANALYSIS

### A.  Count I: Hybrid § 301 Claim

A hybrid § 301 action "comprises two causes of action." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164, 103 S. Ct. 2281, 2290 (1983). The first is a suit against the employer for breach of the collective bargaining agreement; the second is a suit against the union for breach of its duty of fair representation. *Id.* Although "[t]he employee may . . . sue one defendant and not the other. . . . the case he must prove is the same whether he sues one, the other, or both." *Id.* at 165, 103 S. Ct. at 2291. In other words, to prevail on a hybrid § 301 claim, a plaintiff must show *both* that the employer breached the collective bargaining agreement, *and* that the union breached its duty of fair representation; failure to demonstrate either is fatal to a hybrid § 301 claim. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570-71, 96 S. Ct. 1048, 1059 (1976).

17

As mentioned, the Court previously granted GM's motion to dismiss, holding that "Plaintiffs fail[ed] to state a § 301 breach of contract claim against GM." *Kosa*, 2013 WL 6631531, at *8. In light of this holding, which is the law of the case, Plaintiffs cannot succeed on one of the two elements that comprise their hybrid § 301 claim.[3] Accordingly, the Court will grant summary judgment to UAW with regard to Plaintiffs' hybrid § 301 claim. However, the viability of Plaintiffs' separate duty of fair representation claim against UAW is not affected by the Court's resolution of the hybrid § 301 claim. *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 80-83, 110 S. Ct. 424, 433-34 (1989) (duty of fair representation action under NLRA does not require concomitant claim against employer for breach of contract). The Court now addresses Plaintiffs' stand-alone duty of fair representation claim, which is the subject of Count II of Plaintiffs' second amended complaint.

### B. Count II: Breach of Duty of Fair Representation

#### 1. Law

Plaintiffs' duty of fair representation claim is brought under § 9(a) of the NLRA, which is codified at 29 U.S.C. § 159(a). "Section 9(a) of the National Labor Relations Act, by virtue of its grant of exclusive representation status to a

---

[3] In the section of their response brief devoted to the breach of contract aspect of their hybrid § 301 claim, Plaintiffs do not argue that ACC breached any contract, much less one between it and UAW. *See* Pls.' Resp. to Mot. for Summ. J. at 27-30.

union over employees that make up a bargaining unit, creates a duty of fair representation on the representative union." *Pratt v. United Auto., Aerospace & Agric. Implement Workers of Am.*, 939 F.2d 385, 388 (6th Cir. 1991). To prevail on a breach of duty of fair representation claim, a plaintiff must show that the union's actions were "arbitrary, discriminatory, or in bad faith." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010); *see also Vaca v. Sipes*, 386 U.S. 171, 177, 87 S. Ct. 903, 910 (1967) (union has "obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct"). The duty of fair representation "applies in all contexts of union activity, including contract negotiation, administration, enforcement, and grievance processing." *Merritt*, 613 F.3d at 619.

"[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S. Ct. 1127, 1130 (1991) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S. Ct. 681, 686 (1953)). To show that the union breached its duty of fair representation by engaging in discrimination, a plaintiff must "adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n v. Lockridge*, 403

U.S. 274, 301, 91 S. Ct. 1909, 1925 (1971).  Finally, "[a] union acts in bad faith when it acts with an improper intent, purpose, or motive encompassing fraud, dishonesty, and other intentionally misleading conduct."  *Merritt*, 613 F.3d at 619 (internal quotation marks, ellipses, brackets, and citation omitted).

In addition, the Supreme Court has instructed courts to review union action under a highly deferential standard, cognizant that union officials are not lawyers, and avoid judging a union's actions with the benefit of hindsight.  *See O'Neill*, 499 U.S. at 78, 111 S. Ct. at 1135 ("Any substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities."); *Marquez*, 525 U.S. at 45-46, 119 S. Ct. at 300 ("[T]he union [has] room to make discretionary decisions and choices, even if those judgments are ultimately wrong."); *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 539 (6th Cir. 2003) ("When reviewing a union representative's actions or omissions, we must never lose sight of the fact that union agents are not lawyers, and as a general proposition, cannot be held to the same standard as that of licensed professionals."); *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994) ("[M]ere negligence or poor judgment on the part of the union will not support a claim of unfair representation.").  "In order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the

20

plaintiff must point the court to evidence in the record" supporting the conclusion that the union's actions were arbitrary, discriminatory, or in bad faith. *Merritt*, 613 F.3d at 619.

### 2.  Application

Plaintiffs allege in their second amended complaint that UAW breached its duty of fair representation principally[4] in the following three ways:

- By concealing and turning down the $140,000 buyout offers proposed by GM and/or ACC in the three draft SAPs in 2008. *See* Second Am. Compl. ¶¶ 24-25, Pls.' Resp. to Mot. for Summ. J. at 30-31.

- By telling EBU employees in mid-2009, at the time they were considering whether to ratify the 2009 SAP, that they had no right to flow back to GM, and by failing to ensure that that a flow back option was available in the 2009 SAP. *See* Second Am. Compl. ¶¶ 19-21; Pls.' Resp. to Mot. for Summ. J. at 32-33.

- By providing EBU employees with erroneous information at the June 7, 2009 information meeting about the 2009 SAP, namely, that EBU employees would never see the inside of a GM plant and that ACC would shut down if the 2009 SAP was not ratified. *See* Second Am. Compl. ¶¶ 19-20, Pls.' Resp. to Mot. for Summ. J. at 32-33.

---

[4] Plaintiffs' response to UAW's motion for summary judgment contains references to numerous allegations of wrongdoing by UAW.  However, the three principal allegations that form the basis for Plaintiffs' breach of duty of fair representation claim are the three listed by the bullet points below.  The remaining allegations referenced in Plaintiffs' brief opposing summary judgment do not support Plaintiffs' claim that UAW breached its duty of fair representation for one or more of the following reasons: (1) the allegation is unsupported by record evidence; (2) the allegation is not included in the second amended complaint; (3) the allegation, even if true, is an insufficient basis on which a reasonable factfinder could find that UAW breached its duty of fair representation; (4) Plaintiffs do not cite authority supporting their argument that the allegation amounts to a breach of UAW's duty of fair representation.

As discussed, the Court must determine, using the standards and rules outlined above, whether a reasonable factfinder could conclude that UAW's actions or inactions were arbitrary, discriminatory, or in bad faith. The Court addresses each allegation in turn.

Plaintiffs contend that UAW breached its duty of fair representation when it failed to inform EBU employees of $140,000 buy-out "offers" in 2008 and "turned down" those offers. Pls.' Resp. to Mot. for Summ. J. at 30. However, Plaintiffs' argument is unpersuasive for two reasons. First, there is no evidence that 2008 SAP proposals that included the $140,000 buyout were, in fact, "offers" that (1) should have been brought to the attention of Local 659's membership, and (2) were rejected and/or ultimately not implemented due to the actions of UAW. Toldo explained in his deposition that his job was to bring SAPs to the attention of Local 659 membership only after they have been accepted by all parties, and that the three 2008 SAP proposals had not been accepted by all parties and were therefore not "offers," even if he had mistakenly used that term to describe them: "[T]hey really weren't offers, they weren't offers but I did use that term and that was wrong to use that. There were discussions going on between those parties [GM, International Union, and ACC]" that "had not reached the stage yet where there were agreements." Toldo Dep. at 102-03, 106-07. The record does not shed light on why the three SAP proposals in 2008 did not materialize into agreements, nor is

there evidence suggesting that the draft SAPs were ultimately not implemented due to the actions of any UAW official.  Therefore, Plaintiffs' contention that UAW breached its duty of fair representation by failing to bring the 2008 SAP proposals to the attention of Local 659 membership and by rejecting those proposals is unsupported by the evidence.

Second, even if the record contained evidence on which a reasonable factfinder could rely to conclude that the actions of UAW officials impeded the implementation of the three draft SAPs in 2008, or even that UAW did not press hard enough to implement those proposals, Plaintiffs' argument that such actions would constitute a breach of UAW's duty of fair representation would still fail. The Supreme Court has instructed lower courts not to second-guess union action with the benefit of hindsight:

> [T]he union [has] room to make discretionary decisions and choices, even if those judgments are ultimately wrong.  In [*Air Line Pilots Association, International v. O'Neill*], for example, the union had negotiated a settlement agreement with the employer, which in retrospect proved to be a bad deal for the employees.  The fact that the union had not negotiated the best agreement for its workers, however, was insufficient to support a holding that the union's conduct was arbitrary.  A union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation.

*Marquez*, 525 U.S. at 45-46, 119 S. Ct. at 300 (citations to *O'Neill* omitted).  Here, Grimes testified that UAW's general strategy was to not accept "the first offer that GM gave us in bargaining," and to "stall[]" or "delay" the implementation of

23

agreements involving the loss of first-tier wages and benefits to EBU employees. Grimes Dep. at 100-103.   There is no evidence suggesting that these strategies were "irrational" or employed in "bad faith," which is the standard governing Plaintiffs' claim that UAW breached its duty of fair representation by "turning down" the 2008 SAP proposals. *See O'Neill*, 499 U.S. at 67, 111 S. Ct. at 1130.

There is, however, evidence suggesting that UAW should have, in retrospect, pressed for the implementation of the 2008 SAP proposals, as the options available in those proposals were more favorable to EBU employees than the options available in subsequent proposals.   But there is no evidence suggesting that UAW could have known this at the time.   Schwartz testified that the amount of incentive money that GM was willing to offer in SAPs did not decrease until "near the end of 2008 into 2009 . . . when . . . the . . . CEOs went to Washington in December of 2008" and "the fact that companies were asking for money from the government put a crimp on a lot of spending and a lot of things that went on at GM."   Schwartz Dep. at 65.   Moreover, according to Grimes, GM did not threaten to stop subsidizing the first-tier wages and benefits of EBU employees until the beginning of May 2009, at which time the parties started negotiating the 2009 SAP and UAW's goal was to "get the best [it] could from GM."   Grimes Dep. at 52-53, 55, 79-80.   Therefore, at the time UAW allegedly "turned down" the favorable $140,000 buy-out offers, UAW did not know that GM's future financial

circumstances would prevent it from offering better options later.  While UAW's purported decision to reject draft SAPs containing the $140,000 buy-out offer was "ultimately wrong," Supreme Court precedent does not allow this Court to review the decision with the benefit of hindsight.  *See Marquez*, 525 U.S. at 45-46, 119 S. Ct. at 300.

For these reasons, the Court rejects Plaintiffs' argument that UAW breached its duty of fair representation in its handling of the three 2008 draft SAPs.

Plaintiffs next argue that UAW breached its duty of fair representation by failing to advise EBU employees before they voted to ratify the 2009 SAP that they had the option, derived from the 1996 MOU (for Red Dots) and the 2004 Contract for Transportation Services (for Yellow Dots), to flow back to GM, and by telling EBU employees that they did not have flow back rights.  Plaintiffs also fault UAW for not doing more to ensure that the flow back option was included as an option in the 2009 SAP.

However, as explained by UAW in its brief, and the Court agrees, only Red Dots had flow back rights.  Plaintiffs do not argue that the 1996 MOU conferred flow back rights to Yellow Dots, nor could they.  The 1996 MOU grants conditional flow back rights only to the class of GM workers "who [were] transferred [from GM] to [ACC] . . . as of the effective date of the sale [of GM's NAO-T unit to ACC]," UAW Ex. 4 at UAW 000214, in other words, to Red Dots.

25

Instead, Plaintiffs contend that the 2004 Contract for Transportation Services conferred flow back rights to Yellow Dots. But that agreement required GM to *either* offer employment to non-retiring Yellow Dots by a certain date, *or* continue subsidizing the employee's wages and benefits "until such time as all such 'yellow dot' EBU Employees have returned to GM, retired, or have been converted to PBU Employees." UAW Ex. 22 at UAW 0001182, 0001186. Plaintiffs fail to acknowledge that GM had a choice among two options, only one of which involved the possibility of employment with GM, instead asserting that the agreement "guaranteed all EBU Employees . . . jobs with GM." Pls.' Resp. to Mot. for Summ. J. at 5. Plaintiffs' interpretation of the agreement is not supported by the contract language, nor do Plaintiffs explain why they believe their interpretation is correct. Because Yellow Dots did not have flow back rights, they were not harmed by UAW's failure to advise them about such rights. *See Matthews v. Milwaukee Area Local Postal Workers Union, AFL-CIO*, 495 F.3d 438, 441 (7th Cir. 2007) (to prevail on breach of duty of fair representation claim, plaintiff must show harm resulting from union's breach). Therefore, the 163 Yellow Dot Plaintiffs cannot establish that UAW breached its duty of fair representation by failing to advise them of a flow back option, as that option was not available to them. Accordingly, UAW is entitled to summary judgment with

regard to the claims of the 163 Yellow Dots that UAW failed to advise them of a flow back option.

This leaves the claims of the thirty-seven Red Dots Plaintiffs. Lerew attested that three of the thirty-seven retired before 2009. UAW Ex. 2 ¶ 4. Because those three Plaintiffs could not have been harmed by UAW's purported failure to advise them of their flow back rights in mid-2009, UAW is entitled to summary judgment with regard to the flow back-related claims of those three Plaintiffs.

This leaves thirty-four remaining Plaintiffs, all of whom were Red Dots that had not retired prior to 2009. In construing the evidence in the light most favorable to Plaintiffs, the non-moving parties, the Court finds sufficient evidence in the record to support their position that UAW officials informed them that they did not have the right to flow back to GM. *See* Short Dep. at 17-19 (testifying that EBU employees were told that they did not have flow back rights); LaFave Dep. at 31 (testifying that he was told that "go[ing] back to the plant" was "not an option"). The Court also finds sufficient evidence in the record on which a reasonable factfinder could rely to conclude that this advice was erroneous because, first, the 2009 SAP itself provides that Red Dots "have contractual flow back rights to GM," UAW Ex. 13 at UAW 001433; second, there is nothing in the record establishing that the thirty-four remaining Red Dot Plaintiffs could not have

27

attempted to flow back to GM instead of, or in addition to, selecting one of the three options available in the 2009 SAP; and third, UAW does not argue that the remaining Red Dot Plaintiffs lacked the ability to attempt to flow back to GM instead of, or in addition to, selecting one of the three options available in the 2009 SAP.[5]

If the factfinder believes that a UAW official told the thirty-four remaining Red Dot Plaintiffs that they did not have the right to pursue the possibility of flowing back to GM, it could reasonably conclude that UAW acted arbitrarily in breach of its duty of fair representation. The Court is cognizant that union officials cannot be held to the same standards as licensed professionals and that mere negligence or poor judgment does not amount to a breach of a union's duty of fair representation. However, the record contains evidence on which a reasonable factfinder could rely to conclude that UAW officials told the remaining thirty-four Red Dot Plaintiffs erroneous information about their rights and options at the time

---

[5] As discussed, Red Dots had the right to flow back, subject to there being an open position, only if they "[made] written application to GM on or before September 14, 1997." UAW Ex. 4 at UAW 000216. UAW cites evidence for the proposition that "very, very few applications" were submitted by the deadline. UAW Br. at 12 (citing Schwartz Dep. at 25). However, the record contains contrary evidence, *see* McEntire Dep. at 15 (testifying that "lots of us" completed applications by the September 14, 1997 deadline), and, in any event, the record is unclear as to whether any – and, if so, which – of the thirty-four remaining Red Dot Plaintiffs submitted an application by the September 14, 1997 deadline. In construing the evidence in the light most favorable to Plaintiffs, and in light of the absence of any contrary evidence, the Court assumes for the present purposes that the thirty-four remaining Red Dot Plaintiffs submitted timely applications.

they were contemplating whether to ratify the 2009 SAP. Tony Short testified that Toldo told EBU employees at the information meeting on June 7, 2009 "that we did not have return rights back to the [GM] plant," and that Bob Eldridge told him that his only options were the three offered in the 2009 SAP. Short Dep. at 14, 17-19. Scott LaFave also testified that Eldridge told him that "go[ing] back to the plant" was "not an option." LaFave Dep. at 31. However, it is undisputed that Red Dots who applied by the deadline had flow back rights that they could have exercised in mid-2009, subject to there being an open position. If the factfinder believes this testimony, it could conclude that UAW irrationally advised Plaintiffs that they lacked rights that they clearly enjoyed. Accordingly, the Court will deny summary judgment with regard to the claims of the thirty-four remaining Red Dot Plaintiffs that they were misinformed about their ability to pursue flow back.

Finally, Plaintiffs contend that UAW breached its duty of fair representation by providing EBU employees with erroneous information at the June 7 information meeting about the 2009 SAP. Plaintiffs complain mainly about purported statements that were made at the meeting to the effect that ACC would soon shut down if EBU employees did not vote to ratify the 2009 SAP and EBU employees would never see the inside of a GM plant. Plaintiffs contend that these statements were untrue when made and that they induced them to vote in favor of ratifying the 2009 SAP. While the record is disputed as to whether these statements were made

29

and by whom, the Court construes the evidence in the light most favorable to Plaintiffs and assumes for the present purposes that the statements were made by UAW officials.

Even if they were made by UAW officials, the statements do not amount to a breach of UAW's duty of fair representation given the economic circumstances at the time. The record contains uncontroverted evidence that ACC would have, in fact, been in serious trouble had the 2009 SAP not been implemented. According to David Lerew, ACC's director of labor relations, "ACC would not have been financially viable in the short or long term had the 2009 . . . SAP not been approved and implemented" because "rejection of the 2009 . . . SAP would have made it impossible to continue the operation of ACC without debilitating and unacceptable losses." UAW Ex. 2 ¶ 2. The record contains no contrary evidence suggesting that UAW officials knew that ACC would have remained financially viable without implementation of the 2009 SAP. Therefore, a reasonable factfinder could not find that UAW coerced Plaintiffs into ratifying the 2009 SAP, in violation of the duty of fair representation, by maliciously or arbitrarily telling EBU employees that ACC would shut its doors in the event the 2009 SAP was not ratified.

Similarly, Plaintiffs point to no evidence on which a reasonable factfinder could rely to conclude that UAW officials breached their duty of fair

representation by telling EBU employees that they would never see the inside of a GM plant.  To show that the statement was made in violation of UAW's duty of fair representation, Plaintiffs must present evidence of "bad faith," or "an improper intent, purpose, or motive encompassing fraud, dishonesty, and other intentionally misleading conduct."  *Merritt*, 613 F.3d at 619 (internal quotation marks, ellipses, brackets, and citation omitted).  Plaintiffs admit in their brief that "it is not clear what the defendants' motives were for lying and steering the members toward ratifying the [2009] SAP," Pls.' Resp. to Mot. for Summ. J. at 32, and have presented no evidence that the UAW official who allegedly told EBU employees that they would never see the inside of a GM plant harbored a malicious motive.  Although the record would support the conclusion that the view that EBU employees would never see the inside of a GM plant was "mistaken," McEntire Dep. at 40-41, controlling case law counsels that "mere negligence or poor judgment on the part of the union will not support a claim of unfair representation."  *Black*, 15 F.3d at 584.  Given the economic climate at the time and the fact that the continued financial viability of the "single customer" on which ACC was "substantially dependent" was uncertain, UAW Ex. 2 ¶ 2, it was not unreasonable for UAW officials to project that EBU employees would never see the inside of a GM plant.  McEntire testified that he thought the chances of EBU employees going back to GM were "pretty slim based on the climate that we were

in," McEntire Dep. at 40-41, and Toldo shared a similar outlook, *see* Toldo Dep. at

127-28 (testifying that he thought EBU employees should ratify the 2009 SAP

because he "didn't want to take the chance on losing 500 jobs.").   In light of the

bleak circumstances at the time and the absence of evidence indicative of bad faith,

the Court concludes that a reasonable factfinder could not find that UAW breached

its duty of fair representation by telling EBU employees that they would never see

the inside of a GM plant.

### C.  Count III: Fraud Under Michigan Law

In Count III of their second amended complaint, Plaintiffs allege that UAW

is liable for fraud under Michigan law because it

> knowingly made misrepresentation[s] before and during negotiations
> for the 2009 . . . SAP, which fraudulently induced plaintiffs to ratify
> the SAP and sign up for one of three options that did not include the
> flow-back rights guaranteed to plaintiffs under the 1996 MOU, and
> which misled the plaintiffs to plaintiffs' detriment, causing damages.

Second Am. Compl. ¶ 71.  Therefore, the factual basis for Plaintiffs' fraud claim is

the same at the factual basis for their duty of fair representation claim under the

NLRA.  As such, UAW contends that Plaintiffs' state law fraud claim is preempted

by the NLRA.

State law claims based on the same facts as a federal fair representation

claim are preempted by federal labor law:

> The doctrine of preemption is firmly established in labor law.  The
> duty of fair representation relates to an area of labor law which has

> been so fully occupied by Congress as to foreclose state regulation. Whether union conduct constitutes a breach of the duty of fair representation is a question of federal law. The fact that an action for failure to fairly represent a member may be brought in a state court is beside the point. Regardless of the forum in which the claim is presented, the case is controlled by federal law.

*Maynard v. Revere Copper Prods., Inc.*, 773 F.2d 733, 735 (6th Cir. 1985) (citations omitted); *see also Burklow v. Baskin-Robbins USA, Co.*, 274 F. Supp. 2d 899, 906 (W.D. Ky. 2003) ("[W]here a plaintiff's state law tort claim is based upon the same factual allegations as his federal claim for breach of the duty of fair representation, the state claim is effectively preempted by federal labor law."). Because Plaintiffs' state law fraud claim and federal breach of fair representation claim share the same factual basis, the state law fraud claim is preempted by the NLRA.

Plaintiffs urge the Court to apply the preemption framework discussed in *Alongi v. Ford Motor Co.*, 386 F.3d 716, 724 (6th Cir. 2004), and *CNH American LLC v. International Union*, 645 F.3d 785, 790 (6th Cir. 2011). However, those cases did not involve breach of duty of fair representation claims against the union. Therefore, the preemption standard articulated in those cases is not relevant here.

## V. CONCLUSION

For the reasons discussed above, UAW's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** as follows: **GRANTED** as to Plaintiffs' hybrid § 301 claim; **GRANTED** as to Plaintiffs' fraud claim under

Michigan law; **GRANTED** as to the breach of duty of fair representation claim asserted by the Yellow Dot Plaintiffs; **GRANTED** as to the breach of duty of fair representation claim asserted by the three Red Dot Plaintiffs who retired before 2009; **DENIED** as to the breach of duty of fair representation claim asserted by the remaining thirty-four Red Dot Plaintiffs.  In addition, UAW's motion for sanctions is **DENIED**.[6]

      **SO ORDERED**.

Dated: October 2, 2015          s/PATRICK J. DUGGAN
                                     UNITED STATES DISTRICT JUDGE

Copies to:

Counsel of Record

---

[6] In its sanctions motion, UAW seeks Rule 11 sanctions against Plaintiffs' attorney for allegedly violating his duty to perform an adequate pre-filing inquiry into the factual and legal basis for this lawsuit and for allegedly violating his ongoing obligation to reevaluate whether the case is well grounded in fact and law.  UAW seeks compensation from Plaintiffs' attorney "for the unnecessary expense incurred in having had to defend this baseless lawsuit."  Mot. for Sanctions at 2. However, the Court does not view this lawsuit as "baseless" inasmuch as it concludes that UAW is not entitled to a full grant of summary judgment.  Because Plaintiffs' attorney has not engaged in sanctionable conduct, UAW's motion for sanctions is denied.

34